IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Kimberlee Rae Carbone, <br>       Plaintiff, <br><br>       v. <br><br> The City of New Castle; The County of Lawrence; Chief Robert Salem; Officer David Maiella; Officer Terry Dolquist; Officer Sheila Panella; Correction Officer April Brightshue; Correction Officer Niesha Savage; Commander Mark Keyser; Attorney Joshua Lamancusa; Jameson Health Systems; and Bernard Geiser, M.D., <br><br>       Defendants. | ) <br> ) <br> ) <br> )   Civil Action No. 15-1175 <br> )   Chief Magistrate Judge Maureen P. <br> )   Kelly <br> ) <br> ) <br> )   Re: ECF Nos. 137, 139, 141, 145, <br> )   149, 153, 156 and 160 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## OPINION AND ORDER

**KELLY, Chief Magistrate Judge**

Plaintiff Kimberlee Rae Carbone ("Plaintiff"), filed this action under 42 U.S.C. § 1983 against numerous individuals and entities who were allegedly involved in her arrest and subsequent strip and cavity searches following a traffic stop on November 3, 2013; to wit: the City of New Castle ("New Castle"), New Castle Chief of Police Robert Salem ("Salem"), New Castle Police Officer David Maiella ("Maiella"), New Castle Police Officer Terry Dolquist ("Dolquist"), New Castle Police Officer Sheila Panella ("Panella") (collectively, "the New Castle Defendants"); the County of Lawrence ("Lawrence County"), Lawrence County Corrections Officer April Brightshue ("Brightshue"), Lawrence County Corrections Officer Neisha Savage ("Savage"), Lawrence County Corrections Commander Mark Keyser ("Keyser"), Lawrence County District Attorney Joshua Lamancusa ("Lamancusa") (collectively, "the Lawrence County Defendants"); Jameson Health System ("Jameson"); Bernard Geiser, M.D. ("Geiser"); and Kim Fee ("Fee").

Presently before the Court are eight motions for summary judgment filed by the various Defendants. For the reasons that follow, all eight Motions will be granted.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

The record shows that on the evening of November 3, 2013, Defendant Maiella was on stationary patrol in his police cruiser near Crestview Garden Apartments ("Crestview") in New Castle, Pennsylvania, which is a housing complex known to be a high drug trafficking area. Maiella observed a minivan pull up and, according to Maiella, an unknown male exited from the passenger side of the minivan and entered the building. Maiella testified that the man returned to the minivan within two minutes and that the short period of time he was in Crestview is consistent with the distribution -- either a buy or a "drop off" -- of illegal narcotics. Plaintiff, however, contends that it was she who exited the vehicle and went into Crestview where she remained for fifteen to twenty minutes while her male passenger remained in the car. Nevertheless, it is undisputed that when the minivan pulled away from the complex, Maiella followed it.

Shortly thereafter, Maiella observed the vehicle stop at an intersection at Ray Street, at which point the turn signal was activated and the vehicle turned left. Because the Pennsylvania Motor Vehicle Code ("MVC") requires that turn signals be activated at least 100 feet before turning, Maiella pulled the vehicle over. Although Plaintiff denies that she failed to activate her turn signal in a timely manner, she does not dispute that when Maiella approached the vehicle he smelled the odor of burnt marijuana coming from the minivan and observed that Plaintiff's eyes were red and glassy. Accordingly, Maiella contacted Defendant Dolquist, who was the acting Officer in Charge, to obtain a canine unit. Dolquist then came to the scene of the traffic stop and was apprised of what had occurred by Maiella. Dolquist also recognized Plaintiff's name as

someone associated with "muling" for drug traffickers and recognized Plaintiff's passenger as a drug trafficker from Detroit who Dolquist had previously arrested.[1]  Dolquist then contacted Defendant Salem to obtain approval for a canine unit to come to the scene.

Maiella testified that while waiting for the canine unit to arrive, he spoke with Plaintiff who admitted to him that she had been smoking marijuana that day.  Plaintiff's testimony in this regard is somewhat equivocal testifying at her deposition alternatively that she didn't think she smoked marijuana that day but twice conceded that she may have and that, if she had smoked, she may have told Maiella that she did.  Nevertheless, because under Pennsylvania law an individual may not operate a motor vehicle with any amount of a Schedule I controlled substance in his or her blood, Maiella arrested Plaintiff for Driving Under the Influence ("DUI").  While performing a search incident to arrest, Maiella discovered $1,375.00 in cash and two cell phones on Plaintiff's person.

Plaintiff was then placed in the back of a police cruiser following which Maiella and Dolquist observed Plaintiff making "weird movements" and trying to reach into her shorts leading Maiella and Dolquist to believe that Plaintiff was trying to conceal narcotics or other contraband.  Plaintiff admits that she was "fidgeting" in the back seat but testified at her deposition that it was because her handcuffs were too tight.  Notwithstanding Plaintiff's deposition testimony, Maiella and Dolquist made the decision to have a strip search conducted and, because no female officers were on duty at the New Castle Police Department at the time, transported Plaintiff to the Lawrence County Jail ("LCJ") where female Corrections Officers were available to perform the search.

---

[1] Dolquist described a "mule" as a "white female of nondescript supposed to give the police the idea that there's nothing going on, driving around a drug dealer to make his deliveries and stuff like pickups and stuff.  It's usually a white female."  ECF No. 151- 7 at 9.  See http://www.dictionary.com/browse/mule?s=t (a mule "refers to a person paid to carry or transport contraband, especially drugs").

Once at the LCJ, Defendant Brightshue patted Plaintiff down and, having found no weapons, un-cuffed Plaintiff and escorted her into a room designated for strip searches along with Savage, shutting the door behind them.  Both Brightshue and Savage observed Plaintiff repeatedly pressing her fingers into her vagina from the outside of her clothes despite commands by Brightshue to stop, and only removed her clothes after being directed to do so numerous times.  Once her clothes were removed, it appears that Plaintiff continued to press her fingers into her vagina causing Brightshue to re-cuff Plaintiff.  Brightshue then conducted the search which revealed a clear plastic baggie protruding from Plaintiff's vagina.  That information was conveyed to Maiella and Dolquist as well as Brightshue's commanding officer, Defendant Keyser, who were outside the search room.  Brightshue also reported that, rather than remove the baggie as directed, Plaintiff pushed it deeper into her vagina.

During the strip search, although denied by Plaintiff, Brightshue and Savage also observed Plaintiff chewing something which Plaintiff repeatedly refused to spit out.  When she finally did spit it into Brightshue's hand it appeared to be chewing gum with pieces of paper mixed into it.  Because lottery tickets are frequently used to package heroin, Maiella and Dolquist suspected that the gum contained heroin, which was confirmed by subsequent lab testing.

At this point, Dolquist contacted Salem, in his capacity as Chief of Police, and apprised him of the above events and Dolquist's belief that the possibility that Plaintiff had ingested heroin and had a bag of heroin lodged in her vagina presented a medical emergency.  Salem agreed and Plaintiff was then transported to Jameson, a community hospital in New Castle, by Maiella and Dolquist for a medical examination.

At Jameson, Maiella and Dolquist were met by Salem. Defendant Panella was also summoned to the hospital so that a female officer could secure the exam room during the examination. Plaintiff was examined by Doctor Geiser who initially checked Plaintiff for signs of overdosing and then performed a digital examination of her vagina and rectum and a speculum examination of her vagina similar to a routine gynecological exam. Only Geiser, Panella and two nurses were in the room behind closed doors when the exams were performed. No baggie was found during the examinations and Dr. Geiser suggested that a CT scan be taken to "make sure" that there was nothing in her upper digestive system which could have been fatal. The CT scan revealed a substance in Plaintiff's vaginal canal which Geiser felt may have been a medical issue, *i.e.*, a yeast infection. Geiser therefore conducted a second vaginal exam to obtain samples of the substance, which lab reports showed was in fact a yeast infection, and to make sure Plaintiff was medically clear. Although Plaintiff contends that she did not consent to any of the examinations, the record, including Plaintiff's own deposition testimony, is largely to the contrary. It should also be noted here that lab results of Plaintiff's urine and blood samples taken at Jameson were positive for cocaine and marijuana. Plaintiff was given a prescription for the infection and was released from the hospital and police custody.

Plaintiff filed a Complaint on September 8, 2015, ECF No. 1, which she amended on December 2, 2015. ECF No. 29. In the Amended Complaint, which remains the operative complaint, Plaintiff has brought a Fourth Amendment claim for unreasonable search and seizure against Defendants Lamancusa, Salem, Maiella, Dolquist and Panella (Count I); a Fourth Amendment claim for unreasonable search and seizure against Defendants Brightshue, Savage and Keyser (Count II); a Fourth Amendment claim for unreasonable search and seizure against Defendants New Castle and Lawrence County (Count III); conspiracy to violate Plaintiff's

Fourth and Fourteenth Amendment rights against Defendants Jameson, Geiser, Fee, Lamancusa, Salem, Maiella, Dolquist and Panella (Count IV); a First Amendment retaliation claim against Defendants Lamancusa, Salem, Maiella, Dolquist and Panella (Count V); a Fourteenth Amendment claim for violating Plaintiff's liberty interest in reputation against Defendants Lamancusa, Salem, Maiella, Dolquist and Panella, Keyser, Brightshue and Savage (Count VI); Fourteenth Amendment substantive and procedural due process claims against Defendants New Castle, Lawrence County, Lamancusa, Keyser, Savage, Brightshue, Salem, Maiella, Dolquist and Panella (Count VII); a claim for negligence against Defendants Jameson, Geiser and Fee (Count VIII); a claim against Jameson under a theory of respondeat superior (Count IX); claims for battery against Defendants Jameson, Geiser and Fee (Count X); a claim for false imprisonment against Defendants Lamancusa, Salem, Maiella, Dolquist, Panella, Keyser, Brightshue, Savage, Geiser and Fee (Count XI); claims for civil conspiracy (assault and battery) against Defendants Lamancusa, Salem, Maiella, Dolquist, Panella, Keyser, Brightshue, Savage, Geiser and Fee (Count XII); a claim for negligent supervision against Defendant Jameson (Count XIII); and a claim for intentional infliction of emotional distress ("IIED") against Defendants Lamancusa, Salem, Maiella, Dolquist, Panella, Keyser, Brightshue, Savage, Geiser and Fee (Count XIV). Following the adjudication of the motions to dismiss submitted by the various Defendants, Counts IV, VI, VII, VIII, IX and XII were dismissed with prejudice.  ECF No. 55.[2]  Thus, only Counts I, II, III, V, X, XI, XIII, and XIV remain before the Court.

Defendants Maiella, Dolquist and Panella filed Motions for Summary Judgment on March 17, 2017, ECF Nos. 137, 139 and 141; Defendants Salem and New Castle filed Motions for Summary Judgment on March 20, 2017, ECF Nos. 145 and 149; on March 21, 2017, Defendants Geiser and Jameson filed Motions for Summary Judgment, ECF Nos. 153 and 160;

---

[2] In addition, Defendant Fee was voluntarily dismissed from the action on July 25, 2016.  ECF Nos. 94 and 95.

and a Motion for Summary Judgment was filed by Defendants Brightshue, Keyser, Lamancusa Savage and Lawrence County on March 21, 2017 as well. ECF No. 156. The Motions have been extensively briefed and thus are ripe for review. ECF Nos. 138, 140, 142, 146, 150, 154, 157, 161, 166, 176, 178, 181, 182, 183.

## II.      STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). See Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof"). Thus, summary judgment is warranted where, "after adequate time for discovery and upon motion . . . a party . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007), *quoting* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of demonstrating to the court that there is an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). See Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004). "W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,

there is no genuine issue for trial." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007), *quoting* <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party. <u>Matreale v. N.J. Dep't of Military & Veterans Affairs</u>, 487 F.3d 150, 152 (3d Cir. 2007); <u>Woodside v. Sch. Dist. of Phila. Bd. of Educ.</u>, 248 F.3d 129, 130 (3d Cir. 2001).

## III. DISCUSSION

### A. The New Castle Defendants' Motions for Summary Judgment[3]

#### 1. Defendants Maiella and Dolquist[4]

##### a. Fourth Amendment: unreasonable search and seizure (Count I)

At Count I of the Amended Complaint, Plaintiff has alleged that Defendants Maiella and Dolquist violated her right to be free from unreasonable searches and seizures as provided by the Fourth Amendment to the United Stated Constitution in that they lacked probable cause to stop, detain or interrogate Plaintiff; lacked probable cause to search and seize Plaintiff's vehicle; lacked probable cause to search Plaintiff at the LCJ; and lacked probable cause to search Plaintiff at Jameson. Defendants Maiella and Dolquist seek summary judgment as to Count I because the evidence, construed in the light most favorable to Plaintiff, establishes that Maiella was justified

---

[3] Plaintiff has not responded to the Concise Statement of Material Facts ("CSOF") or the Motions for Summary Judgment filed on behalf of Defendants New Castle and Panella and thus Plaintiff has not only admitted to the facts as stated by Defendants in their CSOF but has seemingly abandoned her claims against them. <u>See</u> <u>Venter v. Potter</u>, 694 F. Supp. 2d 412, 424 n.8 (W.D. Pa. 2010); LCvR 56E. As such, the Court will grant the Motions for Summary Judgment filed on behalf of Defendants New Castle and Panella and dismiss with prejudice Plaintiff's claim brought against New Castle at Count III of the Amended Complaint and Plaintiff's claims brought against Panella at Counts I, V, XI, and XIV.

[4] Plaintiff has brought identical claims against Defendants Maiella and Dolquist and thus their Motions for Summary Judgment will be discussed together. The only factual distinctions between the two are that Dolquist was not present when Maiella effectuated the traffic stop, did not participate in Plaintiff's arrest and it was Dolquist that contacted Defendant Salem from the scene of the stop and from the LCJ where Plaintiff was taken to be searched.

in stopping Plaintiff for violating the MVC and that the subsequent searches of Plaintiff and her vehicle were supported by probable cause.

### (1)    Traffic stop

It is undisputed that the Fourth Amendment protects individuals from "unreasonable searches and seizures."  U.S. Const. Amend. IV.  It is also undisputed that when an officer has "a reasonable, articulable suspicion that criminal activity is afoot," he or she may conduct a brief, investigatory stop without running afoul of the Fourth Amendment.  U.S. v. Delfin-Colina, 464 F.3d 392, 396 (3d Cir. 2006), *quoting* U.S. v. Valentine, 232 F.3d 350, 353 (3d Cir. 2000) (internal quotations omitted).  "Reasonable, articulable suspicion is a 'less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.'"  Id., *quoting* Illinois v. Wardlow, 528 U.S. 119, 123 (2000).  See Commonwealth v. Holmes, 14 A.3d 89, 95 (Pa. 2011).  "The determination of whether an officer had reasonable suspicion that criminal activity was afoot so as to justify an investigatory detention is an objective one, which must be considered in light of the totality of the circumstances."  Id. at 96. See U.S. v. Delfin-Colina, 464 F.3d at 397-98, *citing* Whren v. U.S., 517 U.S. 806, 813 (1996) ("a court should undertake an objective review of the officer's rationale for the investigatory traffic stop . . . . That is, a court should only look to whether specific, articulable facts produced by the officer would support reasonable suspicion of a traffic infraction").  As found by the United States Court of Appeals for the Third Circuit:

> a traffic stop will be deemed a reasonable "seizure" when an objective review of the facts shows that an officer possessed specific, articulable facts that an individual was violating a traffic law at the time of the stop. In other words, an officer need not be factually accurate in her belief that a traffic law had been violated but, instead, need only produce facts establishing that she reasonably believed that a violation had taken place. Consequently, a reasonable mistake of fact "does not violate the Fourth Amendment."

*    *    *

> a mistake of law is only unreasonable when the officer does not offer facts
> that objectively show that the identified law was actually broken. In
> situations where an objective review of the record evidence establishes
> reasonable grounds to conclude that the stopped individual has in fact
> violated the traffic-code provision cited by the officer, the stop is
> constitutional even if the officer is mistaken about the scope of activities
> actually proscribed by the cited traffic-code provision. Therefore an
> officer's Fourth Amendment burden of production is to (1) identify the
> ordinance or statute that he believed had been violated, and (2) provide
> specific, articulable facts that support an objective determination of whether
> any officer could have possessed reasonable suspicion of the alleged
> infraction. As long as both prongs are met, an officer's subjective
> understanding of the law at issue would not be relevant to the court's
> determination.

U.S. v. Delfin-Colina, 464 F.3d 392 at 398, 399-400 (internal citations omitted).

Here, Maiella not only identified the statute that he believed had been violated but has articulated specific articulable facts to support his belief and thus satisfied his burden of production. Specifically, Maiella testified that Plaintiff violated Section 3334(b) of the MVC which provides that:

> Signals on Turning and Starting. At speeds of less than (35) miles per
> hour, an appropriate signal of intention to turn right or left shall be given
> continuously during not less than the last (100) feet traveled by the
> vehicle during turning. The signal shall be given during not less than the
> last (300) feet at speeds in excess of (35) miles per hour. The signal
> shall also be given prior to the entry of the vehicle into the traffic
> stream from a parked position.

75 Pa. C.S.A. § 3334(b). Maiella also testified that when Plaintiff's vehicle arrived at the intersection of Ray Street, he observed that it came to a stop, that the turn signal was activated after it stopped, and then the vehicle turned left onto Ray Street. ECF No. 175-9 at 2-3. Thus, even if Maiella was mistaken about whether Plaintiff failed to activate her turn signal "not less than the last (100) feet" before turning onto Ray Street, he has articulated facts which objectively

10

support a finding that Plaintiff violated Section 3334(b) of the MVC and therefore the stop was constitutional.[5]

Plaintiff's arguments to the contrary are not persuasive. Indeed, Plaintiff does not address the above law or cite to any relevant cases that would warrant the Court's departure from the law as stated. Rather, Plaintiff merely denies that she failed to activate her turn signal before 100 feet of the intersection where she turned onto Ray Street and suggests that Section 3334(b) was merely pretext for stopping her. ECF No. 175-7 at 101-02. Neither argument, however, negates that Maiella has articulated facts that objectively support a finding that a traffic infraction occurred. See Heffron v. Adamar of New Jersey, Inc., 270 F. Supp. 2d 562, 574 (D.N.J. 2003), quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991) (observing that, in opposing a motion for summary judgment, the non-moving party "may not rest upon mere allegations, general denials . . . or vague statements . . ."). Moreover, an officer's motivation for making a stop is irrelevant to a Fourth Amendment analysis as long as the he or she can articulate specific facts that the individual violated a traffic law at the time of the stop. See Whren v. U.S., 517 U.S. at 813 (finding that any argument that the constitutional reasonableness of traffic stops depends on the motivation of the officer is foreclosed and that subjective intentions play no role in a Fourth Amendment analysis); U.S. v. Mosley, 454 F.3d 249, 252 (3d Cir. 2006) ("any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime"); Estate of Smith v. Marasco, 318 F.3d 497, 514 (3d Cir. 2003) ("[i]mproper motive . . . is irrelevant to the question whether the objective facts available to the officers at the time reasonably could have led the officers to conclude that Smith was committing an offense"); U.S. v. Moore, No. 12-2193, 2013 WL

---

[5] Notably, Maiella indicated in his Incident Report that Plaintiff properly used her turn signal at a prior intersection. ECF No. 151-4 at 5.

3742414, at *2 (E.D. Pa. July 17, 2013) ("[t]he fact that the stop was motivated, in part, by the Government's investigation [into a potential drug sale] is immaterial").  As such, to the extent that Plaintiff's Fourth Amendment claim brought at Count I revolves around Maiella's traffic stop, that claim is subject to summary judgment and Defendant Maiella's Motion in this regard will be granted.

### (2)    Probable cause for arrest

The Fourth Amendment prohibits police from making an arrest except "upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV.  "Far from demanding proof of guilt beyond a reasonable doubt, '[p]robable cause exists if there is a "fair probability" that the person committed the crime at issue.'" Dempsey v. Bucknell Univ., 834 F.3d 457, 467 (3d Cir. 2016), *quoting* Wilson v. Russo, 212 F.3d 781, 789 (3d Cir. 2000).  In other words, "probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested."  Id., *quoting* Orsatti v. N.J. State Police, 71 F.3d 480, 483 (3d Cir. 1995).  Moreover, "the standard does not require that officers correctly resolve conflicting evidence or that their determinations of credibility, were, in retrospect, accurate."  Id., *quoting* Wright v. City of Phila., 409 F.3d 595, 603 (3d Cir. 2005).  Accordingly, as noted by the United States Court of Appeals for the Third Circuit, a certain tension exists in assessing the existence of probable cause at the summary judgment stage of the proceedings:

> On the one hand, the summary judgment standard asks whether there is a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), viewing the evidence "in the light most favorable to the non-moving party," *Reedy [v. Evanson*, 615 F.3d [197,] 210 [3d Cir. 2010]. On the other hand, the probable cause standard by definition allows for the existence of conflicting, even irreconcilable, evidence. *See, e.g., Wright*, 409 F.3d at 603.

*   *   *

> While it is axiomatic that at the summary judgment stage, we view the facts in the light most favorable to the nonmoving party, it does not follow that we exclude from the probable cause analysis unfavorable facts an officer otherwise would have been able to consider. Instead, we view all such facts and assess whether any reasonable jury could conclude that those facts, considered in their totality in the light most favorable to the nonmoving party, did not demonstrate a "fair probability" that a crime occurred. Only then would the existence of conflicting evidence rise to the level of a "genuine dispute as to any material fact" such that summary judgment would be inappropriate. Thus, where the question is one of probable cause, the summary judgment standard must tolerate conflicting evidence to the extent it is permitted by the probable cause standard.

Dempsey v. Bucknell Univ., 834 F.3d at 468.

In the instant case, Plaintiff was arrested for DUI. The facts as known to Maiella at the time of arrest are that he observed a minivan operated by Plaintiff pull into Crestview, which he knew to be a well-known high drug trafficking area, with an unknown male in the passenger seat. Although Plaintiff disputes Maiella's contention that her male passenger exited the vehicle and went into the building for only a minute or two (which Maiella and Dolquist both testified is indicative of a drug buy or drop-off), claiming that she was the one that exited the vehicle and was gone for 15 to 20 minutes while her passenger remained in the vehicle, it is undisputed that, after Plaintiff pulled away from the housing complex, Maiella followed her and pulled her over for a violating the MVC. ECF No. 151-6 at 10-11. It is also undisputed that Maiella "smelled the odor of burnt marijuana" emanating from the vehicle and that Plaintiff's eyes were red and glassy.[6] Id. at 11. Maiella consequently contacted Dolquist, the acting Officer in Charge, to request a canine unit. Dolquist subsequently arrived at the scene and recognized Plaintiff's name

---

[6] Although Plaintiff portends to dispute that her eyes were red and glassy, the only evidence she cites to in support thereof is the deposition testimony of Defendant Brightshue in which Brightshue merely stated that she could not recall if Plaintiff's eyes were red and glassy. ECF No. 175-12 at 7, 11. More importantly, however, Plaintiff has not responded to Defendants' CSOF in which Defendants state that Plaintiff's eyes were red and glassy when Maiella pulled her over, and she has not denied or even addressed the issue in her own CSOF. ECF No. 177. Under these circumstances, that Plaintiff's eyes were red and glassy is deemed admitted. LCvR 56C.1. & 56E.

as someone who was a "mule" for drug dealers.  Dolquist also recognized Plaintiff's passenger as an individual from Detroit associated with trafficking drugs in New Castle whom Dolquist had previously arrested.  ECF No. 151-7 at 8-9.  Plaintiff was asked to exit the vehicle at which point, according to Maiella, Plaintiff indicated to him that she had smoked marijuana earlier in the day.  ECF No. 151-6 at 12.  Plaintiff does not dispute that under Pennsylvania law, it is illegal for an individual to operate a motor vehicle with any amount of a schedule I controlled substance, such as marijuana, in her blood.  75 Pa. C.S.A. § 3802(d)(1)(i).  Thus, Plaintiff's admission that she smoked marijuana earlier in the day provided Maiella with probable cause to arrest Plaintiff for DUI.

Plaintiff nevertheless argues that probable cause was lacking because Maiella had no basis to stop Plaintiff in the first instance; that no field sobriety tests were performed; that Maiella testified that he did not smell marijuana on Plaintiff's person; that there was nothing about Plaintiff to suggest that she was overdosing at the time; that nothing was found on Plaintiff when Maiella performed the subsequent search of Plaintiff incident to arrest; and that Plaintiff does not "think" she smoked marijuana that day or told Maiella that she did.  The Court, however, has already found that the traffic stop was constitutional and Plaintiff's other arguments do not negate the existence of probable cause to arrest Plaintiff for DUI.

Indeed, the only argument that potentially impact the Court's finding in this regard, is Plaintiff's testimony that she doesn't think she smoked marijuana that day or told Maiella that she did.  To the extent that Plaintiff is suggesting that Maiella's representation that Plaintiff admitted to smoking marijuana earlier in the day was false or made with reckless disregard for the truth, see Wilson v. Russo, 212 F.3d at 787, the record shows that Plaintiff has never expressly denied smoking marijuana on the day in question.  To the contrary, Plaintiff testified at

her deposition that when Maiella asked her if she had been smoking marijuana she replied only that "I am not eighteen. I do not ride around and smoke weed." ECF No. 175-7 at 32. Moreover, Plaintiff twice conceded that she may have smoked marijuana earlier in the day and that, if she had smoked, she may have told Maiella that she did. ECF No. 151-5 at 18, 26. These equivocal statements made at her deposition do not suffice to show that Maiella "willingly and 'affirmatively distort[ed] the truth'" or that there was a "fair probability" that a crime did not occur. Newsome v. City of Newark, No. 13-6234, 2017 WL 3784037, at *10 (D.N.J. Aug. 31, 2017), *quoting* Wilson v. Russo, 212 F.3d at 788. See Dempsey v. Bucknell Univ., 834 F.3d at 468.[7]

This is particularly true here where Plaintiff has, in essence, conceded that she told Maiella that she smoked marijuana that day. In Defendants' CSOF they have stated that after making the traffic stop Maiella smelled the odor of burnt marijuana coming from the front area of the minivan and that while they were waiting for the canine unit to arrive, Plaintiff admitted to him that she smoked marijuana that day. ECF No. 152 ¶¶ 13, 19. Plaintiff not only failed to file a responsive CSOF specifically denying these facts as required by the local rules, but in her own CSOF, she merely states she does not "believe" she told Maiella that she smoked marijuana that day but she may have, which fails to negate Defendants' representation of the facts. ECF No. 177 ¶ 11. See ECF No. 151-5 at 26. See also LCvR 56C & 56E. Coupled with her testimony that she smokes marijuana "frequently;" that it stays in one's blood stream for a long period of time; that she "absolutely" smoked marijuana prior to November 13, 2014; that it would not be unusual to find cannabinoids in her urine; and that if she had smoked on the day in question she

---

[7] It should also be noted here that Maiella's testimony in this regard is consistent with information set forth in his Incident Report. ECF No. 151-4.

may have told Maiella that she did, the Court finds that no reasonable factfinder could conclude that Maiella lacked probable cause to arrest Plaintiff for DUI.  ECF No. 151-5 at 26, 43.[8]

### (3)    Strip search

Plaintiff also challenges the constitutionality of the strip search conducted at the LCJ.

As previously discussed, the Fourth Amendment protects individuals from "unreasonable searches and seizures."  U.S. Const. Amend. IV.  "As a general matter, warrantless searches are unreasonable."  U.S. v. Whitted, 541 F.3d 480, 484 (3d Cir. 2008) (citations omitted).  Search incident to a lawful arrest, however, is considered a reasonable warrantless search.  U.S. v. Robinson, 414 U.S. 218, 235 (1973).  See Gallagher v. Green, No. 12-3840, 2016 WL 3213346, at *4 (E.D. Pa. June 10, 2016) ("[a]lthough the Fourth Amendment generally requires that a warrant be issued prior to a search, the Supreme Court has recognized a few exceptions to this warrant requirement. One such exception is a search incident to arrest").  A strip search, however, while not unconstitutional per se, is undisputably invasive and may only be conducted within certain parameters; police do not have indiscriminate authority to conduct strip and visual body cavity searches.  Gallagher v. Green, 2016 WL 3213346, at *4, *quoting* Arizona v. Gant, 556 U.S. 332, 339 (2009) (noting that the Supreme Court has indicated that there are boundaries to a search incident to arrest emphasizing that "the scope of a search incident to arrest" needs to be "commensurate with its purposes," which include "protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy").  See id. (declining to construe the language from Robinson, *i.e.*, that in the case of a lawful arrest it is an exception to the warrant requirement and reasonable to conduct a "full search of the person," as a blanket rule that any search incident to arrest is lawful and reasonable").  This is

---

[8] Although not relevant to whether Maiella had probable cause for arrest, it is noted that the canine not only alerted to the presence of drugs in the vehicle, ECF No. 151-6 at 12; ECF No. 151-7 at 14-15, but the results of Plaintiff's blood and urine tests were positive for both marijuana and cocaine.  ECF Nos. 151-1, 151-2.

particularly true where the crime for which the individual has been arrested is a misdemeanor or minor infraction that does not necessitate that the arrestee be detained.  Lear v. Phoenixville Police Dep't, No. 16-1338, 2017 WL 1805964, at *7 (E.D. Pa. May 5, 2017).  Under such circumstances, a search incident to arrest cannot be extended to a body cavity search absent probable cause that the arrestee is in possession of illegal drugs.  Id.  See Doe v. Groody, 361 F.3d 232, 238 (3d Cir. 2004) ("[a] non-protective search must normally be supported by probable cause").

Although the parties both cite to Bell v. Wolfish, 441 U.S. 520, 559 (1979), for the proposition that a warrantless strip search of a detainee is constitutional when there exists a reasonable suspicion that the arrestee possesses drugs or weapons, as noted by the Court in Lear, the Court of Appeals for the Third Circuit has never held that a reasonable suspicion standard applies to situations where an individual has been arrested for a minor infraction and will be released.  Lear v. Phoenixville Police Dep't, 2017 WL 1805964, at *7.  Under such circumstances, this Court finds that the better practice, as found by the Lear Court, is to require an officer to have probable cause that the arrestee is in possession of illegal drugs before a strip search will be condoned.  That having been said, the Court finds that Maiella and Dolquist had the requisite probable cause to warrant a strip search.

In addition to the information available to Maiella set forth above (i.e., that he observed Plaintiff pull into Crestview, which he knew to be a well-known high drug trafficking area; that the passenger left the vehicle, went into the housing complex and returned within one to two minutes;[9] that Maiella smelled burnt marijuana and observed that Plaintiff's eyes were red and glassy when he subsequently stopped Plaintiff for a traffic violation; that when Dolquist arrived

---

[9] Even if the Court were to countenance Plaintiff's version of events that she went to Crestview to pick up some magazines and photographs and was gone for 15 to 20 minutes while her passenger waited for her in the car, the other information available to Maiella suffices to support a finding of probable cause.

at the scene he recognized Plaintiff's name as someone who was a "mule" for drug dealers that the male passenger was a known drug dealer), Maiella also discovered that Plaintiff was in possession of $1375.00 in cash and two cell phones, which Plaintiff does not deny. ECF No. 151-6 at 30-31; ECF No. 151-5 at 41-42.[10] In addition, the canine brought to the scene of the stop twice alerted to narcotics in the vehicle. ECF No. 151-6 at 12; ECF No. 151-7 at 14, 16. Finally, after Plaintiff was placed in the police cruiser she was observed "fidgeting," which she also does not deny, and trying to put her hands down her shorts. ECF No. 151-6 at 14; ECF No. 151-7 at 13-14; ECF No. 175-7 at 38. Dolquist, who has been a police office for eighteen years and a member of the narcotics task force, ECF No. 151-7 at 4, 6, testified that the smell of marijuana coming out of the vehicle and the presence of a known drug dealer in the vehicle, coupled with Plaintiff "making weird movements" in the back seat, that it was "police common sense" that Plaintiff was probably trying to hide something and that, under the circumstances, they had to be sure so that it doesn't "end up in a medical statement because she's trying to hide drugs." ECF No. 151-7 at 16. Dolquist also testified that in his experience, he has "seen people take and get things out of the front of their pants and eat it with their hands cuffed behind their back," and that any movement like Plaintiff was exhibiting is suspicious. ECF No. 151-7 at 13.[11] Under these circumstances, the Court has no difficulty finding that Maiella and Dolquist had probable cause to believe that Plaintiff was attempting to conceal contraband on her person. See

---

[10] Moreover, Defendant Lamancusa testified that the amount of cash and the two cell phones, one being a "burner" phone, found on Plaintiff is consistent with drug trafficking. ECF No. 151-16 at 7, 8. He also testified that he too was familiar with the passenger in Plaintiff's car as one of the "Detroit Boys" who brings narcotics into New Castle from Detroit and was a target of the Drug Task Force. ECF No. 159-2 at 26-28.

[11] Although Plaintiff argues that Maiella admitted at his deposition that Plaintiff could not have placed anything in her vagina or rectum because her hands were cuffed behind her back, review of Maiella's testimony shows that he merely testified that, having searched Plaintiff before placing her in the police cruiser, there was nothing in her hands or pockets. Plaintiff's counsel then asked: "So you knew at that point that she wasn't attempting to place anything either in her anus or her vagina; am I correct?" Maiella's response was "No, sir," which, in this Court's view, indicates that counsel was not correct and that, as far as Maiella knew, Plaintiff was attempting to place something in her anus or vagina. ECF No. 151-6 at 14.

U.S. v. Clemons, No. 08-28, 2010 WL 5979925, at *4 (W.D. Pa. Feb. 17, 2010), *aff'd*, 499 F. Appx. 207 (3d Cir. 2012) (finding that "possession of a large amount of currency in small bills and multiple cell phones are specific circumstances that would reasonably raise suspicion of active, recent, and ongoing drug trafficking activities," and that "it is common for drug traffickers to hide contraband in their underwear or in a body cavity").

The question remains, however, whether the strip search was conducted in a reasonable manner. The Court finds that it was. The record, including Plaintiff's deposition testimony, shows that measures were taken so that the search could be conducted by a female; that in fact the search was performed by two female Corrections Officers at the LCJ; that following an initial pat-down which revealed no weapons, Plaintiff's handcuffs were removed; that Plaintiff was re-cuffed only after she refused to stop pushing her fingers into her vagina; that the search was performed in a private room with the door closed; that no males were permitted to enter the room or were present during the search; and that the entire search was done visually without physically touching any part of Plaintiff's body except, perhaps, to assist Plaintiff in undressing and when her hair was searched. ECF No. 151-5 at 30-32; ECF No. 151-6 at 15; ECF No. 151-7 at 15, 18-19, 21; ECF No. 151-12 at 8, 14-15, 19, 26, 35-38, 40; ECF No. 151-11 at 11, 14-17; ECF No. 159-6 at 35-36. While the Court recognizes that there is nothing pleasant about being the subject of a strip search, nothing about these facts suggest that the search in this case was performed in a manner so as to degrade or humiliate Plaintiff or otherwise run afoul of the Fourth Amendment. Indeed, nowhere in Plaintiff's Brief in Opposition to the Motions for Summary Judgment does she argue that the strip search was performed in an unreasonable manner and has not set forth any facts in her CSOF to support such a conclusion.

### 4)     Body cavity search

With respect to the body cavity searches performed at Jameson, Defendants argue that because Geiser assumed responsibility for Plaintiff's care and treatment once they arrived at Jameson and that Plaintiff consented to the exams, neither Maiella nor Dolquist could have caused or could be held responsible for a Fourth Amendment violation. ECF No. 138 at 20. Plaintiff has not addressed Defendants' argument in this regard, other than to contest Defendants' representation that Plaintiff consented to the search, and thus has otherwise seemingly conceded the issue.

Although Plaintiff now contends that she did not consent to the body cavity searches, the only evidence upon which she relies to support her position is her deposition testimony in which she states that she was crying; that she swore at the police; that she insisted that she was not guilty and said she wanted to leave; and that she verbally resisted removing her clothes. ECF No. 166 at 44-46. Plaintiff also refers to Dr. Geiser's testimony that Plaintiff was in handcuffs and was frustrated, and to the testimony from the emergency room technician, Melissa Heitzenrater, that Plaintiff just "sat there or laid there." Id. at 44.

The only part of this evidence that arguably suggests that Plaintiff did not consent to the internal examination is that she verbally resisted removing her clothes. Plaintiff, however, also testified at her deposition that she never refused to undress herself; that she never physically resisted having her clothes removed; that she never said anything to Geiser or the nurses who were present to indicate that she did not want them to do the exam; that she agreed to let them take her blood; and that she never expressed to Geiser or the nurses that she refused treatment. ECF No. 151-5 at 31, 35, 36, 40, 67. In addition, Geiser also testified that he did not recall Plaintiff being in any distress or argumentative; that after he explained to Plaintiff that the

procedure would take less than a minute and would be similar to when she goes to the gynecologist, she consented to the exam; that he does not remember Plaintiff ever crying; that Plaintiff accepted the fact that the exam would benefit her and she was cooperative and had no problems with the exam; that because the CT scan involved radiation, Plaintiff had to consent to it and that Plaintiff "said, okay," offered no resistance and was cooperative; that, having found some "material" in Plaintiff's vaginal canal on the CT scan which Geiser advised might be a medical problem, Plaintiff agreed to second vaginal exam to obtain samples of the material; that the nurse never told Geiser that she had to forcibly remove Plaintiff's clothing; that Plaintiff consented to the exams and that, if she hadn't, he would never have touched her, even if the police had a court order as he had no reason to and it wouldn't be ethical; and that he never observed Plaintiff refuse treatment or refuse to sign a consent form. ECF No. 151-10 at 9-10, 11, 12-13, 14, 16, 18-19, 20. In addition, Defendant Panella, who was in the room during the exams, testified that she never saw Plaintiff object to any procedure, that she was cooperative with Geiser and that she never saw Plaintiff crying. ECF No. 151-9 at 18, 19, 20. Furthermore, Melissa Gerber, a nurse who was also present during the exams, testified that Plaintiff verbally consented to the procedures as evidenced by the fact that the consent form was signed by two witnesses which is the procedure at Jameson when a patient is unable to sign a consent form herself. ECF No. 151-14 at 7. See ECF No. 151-18.

Under these circumstances, the Court finds that Plaintiff's belated argument that she did not consent to the body cavity searches as evidenced by the fact that she verbally resisted removing he clothes does not serve to create a genuine dispute of a material fact. As found by the Court of Appeals for the Third Circuit, "unsupported deposition testimony, which is contradicted by the record, is insufficient to defeat summary judgment." Thomas v. Delaware

State Univ., 626 F. App'x 384, 389 n.6 (3d Cir. 2015), *citing* <u>N.L.R.B. v. FES</u>, 301 F.3d 83, 95 (3d Cir. 2002) ("Roche's testimony ... amounts to an unsupported, conclusory assertion, which we have held is inadequate to satisfy the movant's burden of proof on summary judgment").  <u>See Synthes, Inc. v. Emerge Med., Inc.</u>, 25 F. Supp. 3d 617, 702 (E.D. Pa. 2014), *quoting* <u>Johnson v. MetLife Bank, N.A.</u>, 883 F. Supp. 2d 542, 549 (E.D. Pa. 2012), *quoting* <u>Gonzalez v. Sec'y for the Dept. of Homeland Sec.</u>, 678 F.3d 254, 263 (3d Cir. 2012) (noting that "as a general proposition, conclusory self-serving affidavits and deposition testimony are insufficient to withstand a motion for summary judgment . . . . However, the issue is not whether Plaintiff has relied solely on his own testimony to challenge the Motions, but whether Plaintiff's testimony, when juxtaposed with the other evidence, is sufficient for a rational factfinder to credit Plaintiff's testimony, despite its self-serving nature"); <u>Martin v. Unknown U.S. Marshals</u>, 965 F. Supp. 2d 502, 532 (D.N.J. 2013), *aff'd sub nom.* <u>Estate of Martin v. U.S. Marshals Serv. Agents</u>, 649 F. App'x 239 (3d Cir. 2016), *quoting* <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. at 586-87 ("[a]s the Supreme Court has explained, only genuine disputes of material fact preclude summary judgment, and the party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts"); <u>Heffron v. Adamar of New Jersey, Inc.</u>, 270 F. Supp. 2d at 574, *quoting* <u>Quiroga v. Hasbro, Inc.</u>, 934 F.2d at 500 (observing that, in opposing a motion for summary judgment, the non-moving party "may not rest upon mere allegations, general denials . . . or vague statements . . .").  <u>See</u> <u>also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 252 ("[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff"); <u>Arrington v. U.S.</u>, 473 F.3d 329, 343 (D.C. Cir. 2006) ("summary judgment is most likely when a plaintiff's claim is supported solely by the plaintiff's

own self-serving testimony, unsupported by corroborating evidence, and undermined . . . by other credible evidence. . ." (internal quotation marks and emphasis omitted)); Brooks v. Am. Broad. Cos., Inc., 999 F.2d 167, 172 (6th Cir. 1993) ("[a]s with a summary judgment analysis, the district court was not required to accept unsupported, self-serving testimony as evidence sufficient to create a jury question").

Nevertheless, the Court finds that the internal examinations performed at Jameson were not unconstitutional. The record shows that following the strip search performed at the LCJ, Brightshue informed Maiella that they observed Plaintiff repeatedly pressing her fingers into her vagina, both inside and outside of her clothing and after she was undressed, and that after Plaintiff removed her clothes they observed a clear plastic baggie protruding from Plaintiff's vaginal area.[12] ECF No. 151-5 at 33-34; ECF No. 151-6 at 37; ECF No. 151-7 at 20; ECF No. 151-11 at 11-13, 16-17; ECF No. 151-12 at 15-23, 28-31, 35-37. Maiella was also informed by Brightshue that, rather than remove the baggie when directed to do so, Plaintiff pushed it farther into her vagina. ECF No. 151-12 at 15-23, 28-31. Further, Brightshue and Savage observed Plaintiff chewing something and, after repeatedly being instructed to spit it out, Plaintiff spit out a piece of chewing gum that appeared to have paper in it. Id. at 31-34. Brightshue handed the gum to an officer standing outside of the search room and stated that she had recovered it from Plaintiff's mouth. Id. at 33-36, 39-40.[13] Both Maiella and Dolquist testified that because lottery

---

[12] Notably, Plaintiff admitted at her deposition that she heard Brightshue and Savage inform Maiella that they saw a plastic baggie protruding from Plaintiff's vaginal area. ECF No. 151-5 at 32. In addition, although Plaintiff contends in her CSOF that Defendant Savage's Incident Report does not indicate that a baggie was seen in Plaintiff's vagina, the Report clearly states that "[d]uring the strip search CO Brightshue did see a baggie hanging from her vaginal area. CO Brightshue did ask me to visual [sic] look to verify her findings. Medical, Unit 1 and the Officers were notified." ECF No. 175-1.

[13] Further, while Plaintiff correctly notes that there is no mention in Savage's Incident Report of the wad of gum and paper recovered from Plaintiff's mouth, it is mentioned in Brightshue's incident report. ECF No. 159-7. Moreover, it is clear from the record that it was Brightshue who conducted the search, Brightshue who told Plaintiff to spit the gum out, Brightshue's hand that Plaintiff spit the gum into, Brightshue who handed the substance to the officers

tickets are used to package heroin (known as a "lottery fold") he suspected that the substance Plaintiff was chewing contained heroin.[14]  ECF No. 151-6 at 16; ECF No. 151-7 at 21.

Given the evidence that Plaintiff was concealing a baggie in her body cavity that she refused to remove, and was concealing something in her mouth that she only reluctantly spit out and which was believed to contain heroin, Dolquist was concerned about drugs entering Plaintiff's bloodstream and both he and Maiella considered the situation a medical emergency. ECF No. 151-6 at 17, 22; ECF No. 151-7 at 21, 34.  In fact, Plaintiff testified that when she asked Maiella why he was driving "like [he] was crazy," Maielle told Plaintiff that she was being taken to the hospital because he was concerned about her overdosing.  ECF No. 151-5 at 33. Having apprised Defendant Salem of the circumstances, Dolquist and Salem agreed that Plaintiff should be transported to Jameson for medical treatment.  ECF No. 151-7 at 21; ECF No. 151-8 at 16.  Indeed, Defendant Geiser, the physician who performed the medical examinations, testified that although he did not know of any absorption problems from having a baggie in the vagina, there would be if Plaintiff had ingested heroin orally or absorbed it through her rectum,[15] that Plaintiff could have died had she not been brought to the hospital, and that if someone was believed to have ingested heroin it would be ill advised to wait until he or she exhibited signs of an overdose before bringing the individual to the hospital.  ECF No. 151-10 at 17-18, 21-22; ECF No. 175-16 at 37.

These facts, in this Court's view, not only demonstrate the existence of probable cause that Plaintiff was in possession of illegal drugs but provide more than a reasonable basis for the

waiting outside, and Brightshue who signed the evidence bag.  ECF No. 151-12 at 32-35, 40-42; ECF No. 151-13 at 7; ECF No. 159-9 at 24-25.

[14] Indeed, subsequent laboratory testing revealed that the gum did in fact contain heroin.  ECF No. 151-2.

[15] Although of no apparent significance, it should be noted here that Geiser did feel a mass in Plaintiff's rectum during the initial examination.  ECF No. 151-10 at 12; ECF No. 151-6 at 21.

decision to transport Plaintiff to Jameson for an emergent internal medical examination. See Lear v. Phoenixville Police Dep't, 2017 WL 1805964, at *7.

Plaintiff's arguments to the contrary do not compel a different result. Indeed, Plaintiff does not address the above facts but argues that there was no probable cause to perform the body cavity search because Geiser was not informed that there was allegedly a baggie in Plaintiff's vagina; that Geiser saw no signs of Plaintiff having taken drugs or that she was overdosing; that Defendant Lamancusa testified that he was not aware of any medical emergency; and Lamancusa requested Plaintiff's "assistance" regarding the passenger in Plaintiff's vehicle who was a known drug trafficker. ECF No. 166 at 18-19. None of these facts, however, has any bearing on what was known to Maiella and Dolquist relative to Plaintiff concealing drugs in her body cavity and ingesting heroin or their belief that the situation constituted a medical emergency. The Court therefore finds that no reasonable fact finder could conclude that the decision to conduct a body cavity search of Plaintiff was unreasonable under the circumstances. See Stricker v. Twp. of Cambridge, 710 F.3d 350, 358 (6th Cir. 2013) ("[c]ircumstances in which it is objectively reasonable to believe a medical emergency exists fit within the exigent circumstances exception"); U.S. v. Porter, 594 F.3d 1251, 1258 (10th Cir. 2010) ("[o]fficers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception" but only "an objectively reasonable basis to believe there is medical assistance . . . needed, or persons [are] in danger"); Hardesty v. Hamburg Twp., 461 F.3d 646, 655 (6th Cir. 2006), citing Mincey v. Arizona, 437 U.S. 385, 392 (1978) ("[t]he Supreme Court has recognized that the warrant requirement of the Fourth Amendment does not necessarily apply to police responding to emergency situations"); Couden v. Duffy, 446 F.3d 483, 496 (3d Cir. 2006), quoting Parkhurst v. Trapp, 77 F.3d 707, 711 (3d Cir. 1996) ("[e]xigent circumstances exist

25

where 'officers reasonably . . . believe that someone is in imminent danger'") (emphasis omitted). Further, the body cavity searches were performed by a doctor in a private and hygienic setting, took a little more than a minute and, as Plaintiff herself testified, was not unlike her yearly gynecological exams. ECF No. 151-5 at 50; ECF No. 151-10 at 11-12. As such, the Motions for Summary Judgments submitted on behalf of Maiella and Dolquist relative to Plaintiff's Fourth Amendment unreasonable search and seizure claims brought at Count I will be granted.

### b.    First Amendment: Retaliation (Count V)

Defendants Maiella and Dolquist argue, correctly so, that they are entitled to summary judgment on Plaintiff's First Amendment retaliation claim brought at Count V of the Amended Complaint because there is no evidence that Plaintiff engaged in any protected First Amendment activity or that Defendants retaliated against Plaintiff for doing so. Plaintiff has not responded to Defendants' argument in this regard and thus has apparently conceded the issue. As such, Maiella and Dolquist's Motions for Summary Judgment in this regard are properly granted as to Count V of the Amended Complaint.[16]

### 2.    Defendant Salem

### a.    Fourth Amendment: unreasonable search and seizure (Count I)

Plaintiff has not challenged Salem's argument that the canine sniff of Plaintiff's vehicle did not constitute a search under the Fourth Amendment and that Salem's authorization relative to calling for the canine unit therefore did not violate Plaintiff's rights provided by the Fourth Amendment. U.S. v. Pierce, 622 F.3d 209, 213 (3d Cir. 2010), *citing* Illinois v. Caballes, 543 U.S. 405, 410 (2005) ("[c]onsistently the Supreme Court has held that an exterior canine sniff of a car during a lawful traffic stop does not amount to a "search" under the Fourth Amendment").

---

[16] Having found that neither Maiella nor Dolquist violated Plaintiff's rights provided by the Fourth or First Amendments the Court need not address Defendants' alternative argument that they are entitled to qualified immunity.

Accordingly, the only Fourth Amendment issues before the Court relative to Salem are whether his approval of the strip search conducted at the LCJ or the body cavity searches conducted at Jameson ran afoul of the Fourth Amendment. Plaintiff's claims in this regard fail for the same reasons that she is unable to succeed on her Fourth Amendment claims brought against Maiella and Dolquist.

With respect to the strip search conducted at the LCJ, Defendant Salem testified that after Dolquist "gave [him] the details of what was going on," he told Dolquist to take her to the LCJ to be searched as was their policy when no females were available in the department. As previously discussed, the details known to Dolquist were that that Plaintiff was observed pulling into Crestview, a well-known high drug trafficking area, with a known drug dealer in the passenger seat; that the smell of burnt marijuana was emanating from the vehicle and Plaintiff's eyes were red and glassy; that Plaintiff's name was known as someone who was a "mule" for drug dealers; that $1375.00 in cash and two cell phones were found on Plaintiff's person; that the canine brought to the scene alerted to narcotics in the vehicle; and that after Plaintiff was placed in the police cruiser she was observed "fidgeting," and trying to put her hands down her shorts. The Court has already found that these facts were more than sufficient to provide the officers, including Salem, with probable cause to believe that Plaintiff was attempting to conceal contraband on her person. Indeed, Salem testified that the nature of the traffic stop, coupled with Plaintiff putting her hands down her pants and acting nervous are a common indicator and "just the elements that we look for when we believe that someone is concealing contraband." ECF No. 151-8 at 13. Because the strip search was supported by probable cause, it follows that Salem's authorization of the search was in keeping with the Fourth Amendment. See Ciardiello v. Sexton, 390 F. App'x 193, 199 (3d Cir. 2010), citing Rogers v. Powell, 120 F.3d 446, 453 (3d

Cir. 1997) ("an officer can lawfully act solely on the basis of statements issued by fellow officers if the officers issuing the statements possessed the facts and circumstances necessary to support a finding of the requisite basis").

Similarly, Salem testified that the decision was made to take Plaintiff to the hospital for a body cavity search based on what transpired at the LCJ, ECF No. 151-8 at 14, *i.e.*, that Brightshue informed Maiella that she and Savage observed Plaintiff repeatedly pressing her fingers into her vagina, both inside and outside of her clothing and after her clothes were removed; that after Plaintiff's clothes were removed they observed a clear plastic baggie protruding from Plaintiff's vaginal area; that, rather than remove the baggie when directed to do so, Plaintiff pushed it farther into her vagina; and that Brightshue and Savage observed Plaintiff chewing something that turned out to be a piece of chewing gum with paper or heroin packets in it. ECF No. 151-8 at 16. At that point, Maiella, Dolquist and Salem all testified that the concern at that point was that Plaintiff had ingested heroin and was concealing heroin in her body cavity thereby creating a medical emergency. ECF No. 151-6 at 17, 22; ECF No. 151-7 at 16, 21; ECF No. 151-8 at 16-17, 20. As already found, these facts as known to Salem at the time provide an ample basis for authorizing a body cavity search thereby precluding a finding that Salem violated Plaintiff's Fourth Amendment rights.

### b.    First Amendment: Retaliation (Count V)

Defendant Salem reiterates the arguments advanced by Maiella and Dolquist relative to Plaintiff's First Amendment retaliation claim brought at Count V of the Amended Complaint. As already discussed, Plaintiff has not responded to Defendants' argument in this regard and thus

had apparently conceded the issue.  As such, Salem's Motion for Summary Judgment will be granted as to Count V of the Amended Complaint.[17]

**B.      The Lawrence County Defendants' Motion for Summary Judgment[18]**

**1.      Fourth Amendment: unreasonable search and seizure (Counts I & II)**

At Count I of the Complaint, Plaintiff has brought Fourth Amendment unreasonable search and seizure claims against Lawrence County Defendant Lamancusa relative to the traffic stop and strip search of Plaintiff at the LCJ as well as the body cavity search performed at Jameson.  At Count II of the Complaint, Plaintiff alleges that Lawrence County Defendants Brightshue, Savage and Keyser violated her Fourth Amendment rights in conducting the strip search a the LCJ.

In their Motion for Summary Judgment, the Lawrence County Defendants initially argue that Lamancusa is entitled to summary judgment with respect to any Fourth Amendment claim relative to the traffic stop, Plaintiff's arrest and the strip search at the LCJ as there is no evidence of record that Lamancusa had any involvement in these matters.  With the exception of Defendant Keyser's testimony that he was told by Maiella that Lamancusa had given permission to have Plaintiff taken to the LCJ to be strip searched, the Court agrees.  Although Plaintiff testified at her deposition that Lamancusa arrived at the scene of the traffic stop, he certainly did

---

[17] Because the Court has found that Salem is not liable to Plaintiff under either the First or Fourth Amendment, Salem's alternative argument that he is entitled to qualified immunity has not been addressed.

[18] As previously discussed, Plaintiff has brought a Fourth Amendment unreasonable search and seizure claim against Defendant Lawrence County at Count III of the Amended Complaint.  In its Motion for Summary Judgment, Lawrence County argues that it is entitled to summary judgment because Plaintiff has failed to identify a custom or policy pursuant to which any of the individual Lawrence County Defendants were acting when they allegedly deprived Plaintiff of her constitutional rights.  ECF No. 157 at 15-17.  See Monell v. Dep't of Social Serv., 436 U.S. 658, 694 (1978).  Plaintiff has failed to address the County's argument in this regard and, indeed, has failed to identify any municipal policy or custom upon which Lawrence County could be held liable.  Accordingly, Lawrence County's Motion for Summary Judgment in this regard is properly granted as to Count III of the Amended Complaint.  In addition, insofar as the Court has found no liability under the Fourth Amendment with respect to the individual Lawrence County Defendants, see discussion *infra*, it follows that Lawrence County cannot be found liable either.

not participate in effectuating the stop in the first instance and there is no evidence that he had any involvement in the decision to arrest Plaintiff. Indeed, Plaintiff makes no such statement in her CSOF nor has she argued so in her Brief in Opposition to the Motions for Summary Judgment. ECF Nos. 166, 177.

Moreover, the overwhelming evidence is that Lamancusa had no involvement in this matter at all until Plaintiff was taken to Jameson where Lamancusa happened to be. Maiella testified that he did not recall Lamancusa being present at the scene of the traffic stop and that he did not call Lamancusa while at the scene. Dolquist also testified that Lamancusa was not at the scene of the traffic stop, and Lamancusa testified that he not only did not go the scene of the stop but that he received no communication from any law enforcement personnel during the stop. ECF No. 151-6 at 12, 35-36, 40; ECF No. 151-7 at 32; ECF No. 159-2 at 49. Further, although Plaintiff testified that Lamancusa arrived at the scene in a black GMC Acadia that was a personal car without a municipal license plate, Lamancusa has indicated that he has never owned a GMC Acadia. ECF No. 151-5 at 25, 60; ECF No. 159-14 ¶ 1. Under these circumstances, the Court is hard pressed to give any countenance to Plaintiff's deposition testimony that Lamancusa was at the scene of the stop. See Thomas v. Delaware State Univ., 626 F. App'x at 389 n.6.

Nevertheless, as set forth above, it is abundantly clear that none of the Lawrence County Defendants can be held liable for a Fourth Amendment violation as Maiella properly stopped Plaintiff based on his belief that Plaintiff had committed a traffic violation, had probable cause to arrest her for DUI, and conduct a search incident to arrest which revealed that Plaintiff was in possession of $1375 in cash and two cell phones. With respect to the subsequent strip search performed by Brightshue, the Court has already found that the decision to subject Plaintiff to a strip search was amply supported by probable cause. Furthermore, Brightshue testified that

Plaintiff was brought to the LCJ for a strip search because there was no female law enforcement officer on duty at the New Castle Police Department at the time; that Maiella and Dolquist indicated that Plaintiff was suspected of concealing narcotics; that Brightshue knew she was checking Plaintiff for contraband; and that Plaintiff refused to obey Brightshue's numerous commands to stop pushing her fingers into her vagina. ECF No. 159-6 at 20, 26-28, 39-49, 52-53, 70-71. Moreover, not only does Savage's testimony largely corroborate Brightshue's recollection of events but she too testified that the New Castle Police said that Plaintiff was brought in "for suspicion of narcotics." ECF No. 159-9 at 9. Under these circumstances, the Court finds that no reasonable fact finder could conclude that the strip search performed by Brightshue was without probable cause or was otherwise without justification.

Further, the record shows that neither Keyser nor Savage participated in the actual strip search. Keyser was not in the search room at all and, although Savage testified that she was present in the room during the search, she was apparently a trainee and was merely watching Brightshue conduct the search having been told by Brightshue to observe the procedures involved. ECF No. 151-12 at 18; ECF No. 159-6 at 18. The only actions Savage took relative to the search was to confirm Brightshue's observation that Plaintiff had a clear plastic baggie hanging out of her vagina. Coupled with the fact that Plaintiff does not argue that the search was conducted in an unreasonable or abusive manner, it cannot be said that the search ran afoul of the Fourth Amendment.

Finally, with respect to Lamancusa's liability relative to the body cavity searches that were conducted at Jameson, Plaintiff argues that Lamancusa directed the warrantless body cavity searches "in retaliation for Plaintiff not cooperating in the investigation of her passenger," who was a known drug trafficker. ECF No. 166 at 32, 34. Notwithstanding that Plaintiff has

abandoned her retaliation claims, it is clear from the record that it was not until after Plaintiff had been taken to Jameson for the body cavity search that Lamancusa allegedly "interrogated" Plaintiff and asked her to assist him in prosecuting her passenger and thus any conversation Lamancusa had with Plaintiff while at Jameson necessarily took place after the decision to transport her there and had no bearing on the decision to conduct a body cavity search. Lamancusa therefore could not have directed the search because Plaintiff failed to cooperate. Moreover, as already found, the decision to take Plaintiff to Jameson for a possible medical emergency -- regardless of who made the decision -- was objectively reasonable under the circumstances. As such, the Motion for Summary Judgments submitted on behalf of the Lawrence County Defendants relative to Plaintiff's Fourth Amendment unreasonable search and seizure claims brought at Counts I and II will be granted.[19]

> 2.    **First Amendment: Retaliation (Count V)**

The Defendant Lamancusa also argues that he is entitled to summary judgment on Plaintiff's First Amendment retaliation claim brought against him at Count V of the Amended Complaint. As already discussed, Plaintiff has not responded to Defendants' arguments in this regard and thus had apparently conceded the issue. Accordingly, the Lawrence County Defendants' Motion for Summary Judgment in this regard will be granted as to Count V of the Amended Complaint as well.

> C.    **Plaintiff's State Law Claims for Battery, False Imprisonment, Negligent Supervision and IIED (Counts X, XI, XIII & XIV)**

Having found that Plaintiff is unable to sustain her Section 1983 claims against any of the Defendants it appears that only state law claims for battery, false imprisonment, negligent

---

[19] As before, having found that the Lawrence County Defendants' actions did not violate Plaintiff's Fourth Amendment rights, the Court has not addressed their alternative argument that they are entitled to qualified immunity.

supervision and IIED remain.  Where all claims over which the Court has original jurisdiction have been dismissed, however, the district court may decline to exercise supplemental jurisdiction over the remaining claims.  28 U.S.C. § 1367(c)(3).[20]  Although declining to exercise jurisdiction is within the discretion of the district court, the United States Court of Appeals for the Third Circuit has held that, absent extraordinary circumstances, "pendent jurisdiction should be declined where the federal claims are no longer viable."  Shaffer v. Bd. of Sch. Dir. Albert Gallatin Area Sch. Dist., 730 F.2d 910, 912 (3d Cir. 1984) (citations omitted).  See Noble v. Gaston, 2009 WL 198252, at *5 (Jan. 27, 2009).

Here, there do not appear to be any extraordinary circumstances surrounding this case which would warrant the exercise of supplemental jurisdiction over plaintiff's state law claims and thus the Court declines to do so.[21]

## IV.     CONCLUSION

For the foregoing reasons, all eight Motions for Summary Judgment before the Court which have been submitted on behalf of Defendants Maiella, ECF No. 137; Dolquist, ECF No. 139; Panella, ECF No. 141; Salem, ECF No. 145; New Castle, ECF No. 149; Brightshue, Savage, Keyser, Lamancusa, Lawrence County, ECF No. 156; Geiser, ECF No. 153; and Jameson, ECF No. 160, will be granted.

---

[20] To the extent that Plaintiff's claim for false imprisonment is brought pursuant to Section 1983, the Court's findings that there was probable cause to arrest Plaintiff and to support the conclusion that Plaintiff was concealing illegal drugs, that the medical exams were necessitated by a perceived medical emergency, and that Plaintiff consented to the searches, preclude a finding that Plaintiff was falsely imprisoned.  James v. City of Wilkes-Barre, 700 F.3d 675, 682-83 (3d Cir. 2012), citing  Wallace v. Kato, 549 U.S. 384, 389 (2007) ("[t]o state a claim for false imprisonment, a plaintiff must establish: (1) that she was detained; and (2) that the detention was unlawful").  See id. at 283 ("[a] false imprisonment claim under § 1983 . . . is based on an arrest made without probable cause").

[21] The Court notes here that only state law claims have been brought against Defendants Jameson and Geiser and thus the Motions for Summary Judgment filed by Jameson and Geiser, ECF Nos. 153, 160, have not been addressed. In addition, Plaintiff has failed to respond to the Motion for Summary Judgment filed by Defendant Jameson and thus the claims brought against Jameson for battery and negligent supervision at Counts X and XIII are subject to summary judgment in any event.

Accordingly, the following Order is entered:

## ORDER

AND NOW, this 20th day of November, 2017, upon consideration of the Motions for Summary Judgment submitted by Defendants, Plaintiff's response thereto, and the various Reply Briefs, IT IS HEREBY ORDERED that the Motion for Summary Judgment submitted on behalf Defendant Maiella, ECF No. 137, is GRANTED; the Motion for Summary Judgment submitted on behalf Defendant Dolquist, ECF No. 139, is GRANTED; the Motion for Summary Judgment submitted on behalf Defendant Panella, ECF No. 141, is GRANTED; the Motion for Summary Judgment submitted on behalf Defendant Salem, ECF No. 145, is GRANTED; the Motion for Summary Judgment submitted on behalf Defendant New Castle, ECF No. 149, is GRANTED; the Motion for Summary Judgment submitted on behalf Defendants Brightshue, Savage, Keyser, Lamancusa, and Lawrence County, ECF No. 156, is GRANTED; the Motion for Summary Judgment submitted on behalf Defendant Geiser, ECF No. 153, is GRANTED; the Motion for Summary Judgment submitted on behalf Defendant Jameson, ECF No. 160, is GRANTED, and that the Clerk of Court is to mark the case closed.

IT IS FURTHER ORDERED that, pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, if the Plaintiff wishes to appeal from this Order she must do so within thirty (30) days by filing a notice of appeal as provided in Rule 3, Fed. R. App. P., with the Clerk of Court, United States District Court, 700 Grant Street, Room 3110, Pittsburgh, PA 15219.

BY THE COURT:


/s/ Maureen P. Kelly
MAUREEN P. KELLY
CHIEF UNITED STATES MAGISTRATE JUDGE

cc: All counsel of record via CM/ECF